WO

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

Nirosh H. De Silva,

Plaintiff,

vs.

Pima County Government, a political subdivision/governmental entity; et al.,

Defendants.

No. CV 24-00200-TUC-MAA

**ORDER**

Pending before the court is the defendants' motion for summary judgment filed on October 17, 2025. Doc. 105. The plaintiff filed a response on June 15, 2026. Doc. 148. The defendants filed a reply on June 30, 2026. Doc. 150. The plaintiff filed a supplemental response on July 15, 2026. Doc. 151. The court conducted a hearing on the motion on August 27, 2026. Doc. 154.

The Magistrate Judge presides over this action having received the consent of all parties pursuant to 28 U.S.C. § 636(c). Doc. 13.

The plaintiff, Nirosh H. De Silva, worked as a Buyer Senior in the Pima County Procurement Department. Second Amended Complaint, Doc. 28, p. 5. He applied for a promotion to the position of Buyer Principal, but his application was denied. Doc. 28, pp. 5-20. He subsequently applied for the positions of Procurement Officer, Business Intelligence Analyst - Senior, and Business Systems Analyst - Technical Writer, but each time, his application was denied. Doc. 28, pp. 5-20. In his Second Amended Complaint, De Silva asserts a cause of action for defamation per se, employment discrimination, retaliation,

and federal civil rights violations. Doc. 28, pp. 20-64. His claims for negligence and negligence per se were previously dismissed. Doc. 65.

On October 17, 2025, the defendants filed the pending motion for summary judgment on all remaining claims. Doc. 105.

The motion will be granted in part. The motion will be granted for all claims except for the intentional discrimination claims arising from De Silva's application for the position of Business Intelligence Analyst - Senior at the Pima County Health Department.

Summary Judgment

Summary judgment is available only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The moving party initially bears the burden of proving the absence of a genuine issue of material fact." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). "Where [as here] the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *Id.* "Where the moving party meets that burden, the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial." *Id.* "[T]he non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor." *Id.*

"In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). "Rather, it draws all [reasonable] inferences in the light most favorable to the non[-]moving party." *Id.*; *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065, n. 10 (9th Cir. 2002) ("At summary judgment, this court need not draw all possible inferences in [the non-movant's] favor, but only all *reasonable* ones.") (emphasis in original).

"If the evidence [supporting the plaintiff's claim] is merely colorable, or is not significantly probative, summary judgment may be granted." *McIndoe v. Huntington Ingalls*

*Inc*., 817 F.3d 1170, 1173 (9th Cir. 2016). "Arguments based on conjecture or speculation are insufficient." *Id*.

Discussion: Defamation

De Silva unsuccessfully applied for four positions: Buyer Principal, Procurement Officer, Business Intelligence Analyst-Senior, and Business Systems Analyst - Technical Writer. Doc. 105, pp. 2-5. After he was denied the Technical Writer position, De Silva sent an email to Pima County's Human Resources Department seeking an administrative review of the hiring process. Motion, Doc. 105, pp. 5-6; Statement of Facts, Doc. 146, ¶¶ 62-63. As part of this administrative review, Defendant Kelly "noted that she remembered Plaintiff hitting a table and acting intensely during his May 10, 2023, interview." Doc. 105, pp. 6-7; Doc. 146, ¶ 68.

Around July 20, 2023, De Silva filed a charge of discrimination with the Arizona Attorney General and with the Equal Employment Opportunity Commission. Doc. 105, p. 7; Doc. 146, ¶ 69. "Defendant Kelly provided a sworn affidavit in which she repeated her statement that Plaintiff hit a table to emphasize his statements during the May 4, 2023 interview for the Technical Writer position and again during the May 10 interview for the Business Systems Analyst – Senior position." Doc. 105, p. 7; Doc. 146, ¶ 70.

According to De Silva, "Defendant Kelly defamed plaintiff when she made blatantly false and defamatory statements to both the County internal review and in the County's response to the [Arizona Civil Rights Division investigation]." Doc. 148, pp. 8-9. He maintains that "[s]he falsely stated that Plaintiff was 'slapping the table abruptly throughout the interview process' and that 'he pounded the table with this fist or open palm as he was answering the questions' in the May 4, 2023, Technical Writer interview and that 'he again pounded the table as he answered the questions' in the May 10, 2024 Business Systems Analyst Senior interview." *Id*. De Silva "denies hitting, slapping or pounding the table at any point during both the Technical Writer interview and the BSA-Senior interviews." *Id*.; Controverting Statement of Facts, Doc. 149, ¶¶ 140-141.

"One who publishes a false and defamatory communication concerning a private person is subject to liability if, but only if, [s]he (a) knows that the statement is false and it defames the other, (b) acts in reckless disregard of these matters, or (c) acts negligently in failing to ascertain them." *Stuart v. City of Scottsdale*, 2022 WL 704121, at *8 (D. Ariz. Mar. 9, 2022) (punctuation modified). "To be defamatory, a publication must be false and must bring the defamed person into disrepute, contempt, or ridicule, or must impeach plaintiff's honesty, integrity, virtue, or reputation." *Id*.

"The requirement of a 'false statement' means the statement must have been an assertion of objective fact." *Lundin v. Discovery Commc'ns Inc*., 352 F. Supp. 3d 949, 960 (D. Ariz. 2018) (punctuation modified), *aff'd*, 796 F. App'x 942 (9th Cir. 2020). "Further, the statement must be susceptible of being proved true or false." *Id*. "Statements involving political invective, opinion, or hyperbole cannot be the basis for a defamation claim." *Id*. "And even assertions of objective facts that are false are not actionable provided they are substantially true." *Id*. "Whether a statement is capable of defamatory meaning is a question of law for the court, but whether the meaning conveyed was defamatory is a question for the jury." *Dube v. Likins*, 216 Ariz. 406, 419, 167 P.3d 93, 106 (Ct. App. 2007).

The defendants argue, among other things, that Kelly's statements are protected by a conditional privilege. They assert that the privilege applies to "[a]ny communication made pursuant to an administrative investigation by the Human Resources Department of the Pima County Government" directed to "a public officer concerning the work of employees supervised by that Human Resources Department." Doc. 105, p. 13 (*citing Lewis v. Oliver*, 178 Ariz. 330, 335, 873 P.2d 668, 673 (Ct. App. 1993)). The court agrees that a conditional privilege applies here.

A conditional privilege exists for statements made by persons assisting in the administrative review of alleged employment discrimination. *Miller v. Servicemaster by Rees*, 174 Ariz. 518, 520, 851 P.2d 143, 145 (Ct. App. 1992) ("[A] conditional privilege exists because public policy dictates that employees must be protected from workplace sexual harassment."). In this case, Kelly made statements to the Pima County Human

Resources (HR) department and to the Arizona Civil Rights Division in connection with their review of De Silva's allegations of workplace discrimination. These statements are conditionally privileged.

De Silva argues that the privilege does not apply because he was not an employee of the Human Resources (HR) department. Doc. 148, p. 13. In fact, he was no longer employed by the County when the statements were made. *Id*. The court does not agree. It does not matter if the HR department had authority over him. What matters is that the HR department had influence over the hiring process going forward and could recommend that the hiring process be changed or that the persons involved be disciplined or retrained. The privilege exists because public policy dictates that the County's employment practices should be free from illegal discrimination, and people should feel free to help that process along. It does not matter if De Silva was an employee of the HR department or even if he was still employed by the County when the statements were made.

The conditional privilege may be defeated by proving the speaker abused the privilege by a showing of "actual malice" or "by demonstrating excessive publication." *Miller v. Servicemaster by Rees*, 174 Ariz. 518, 520, 851 P.2d 143, 145 (Ct. App. 1992). And the showing must be made by "clear and convincing evidence." *Desert Palm Surgical Grp., P.L.C. v. Petta*, 236 Ariz. 568, 580–81, 343 P.3d 438, 450–51 (Ct. App. 2015). De Silva argues first that he can prove "actual malice." Doc. 148, pp. 13-14.

Actual malice "can be demonstrated by proving a defendant made a statement knowing it was false or with reckless disregard of its truth." *Miller v. Servicemaster by Rees*, 174 Ariz. 518, 520, 851 P.2d 143, 145 (Ct. App. 1992). De Silva maintains that Kelly's statements were a "figment of her imagination" and were made without first checking with others who were also present during the interviews. Doc. 148, p. 13.

De Silva, however, must do more than provide evidence that Kelly's statements were false. He must show that she made the statements *knowing* they were false or with *reckless disregard* of their truth. "Reckless disregard" is defined as "a high degree of awareness of probabl[e] falsity." *Hansen v. Stoll*, 130 Ariz. 454, 458, 636 P.2d 1236, 1240 (Ct. App.

1981). "To the extent that mere negligence in ascertaining the truth is insufficient to satisfy this standard, it is a subjective test." *Id*.

De Silva provides no evidence that Kelly knew her statements were a figment of her imagination or knew her memory was so unreliable that she should have checked with others before making her statements. *See, e.g., Hansen v. Stoll*, 130 Ariz. 454, 457-458, 636 P.2d 1236, 1239-1240 (Ct. App. 1981) (Defendant's statements that federal agents perjured themselves at his trial and were "collaborating with his political foes" were made with "reckless disregard" because they were made after he unsuccessfully appealed his conviction and after "[h]is claims of conspiracy and smuggling were investigated and found to be without merit."). De Silva fails to provide clear and convincing evidence from which a reasonable trier of fact could find in his favor on the issue of actual malice.

De Silva further asserts that "[i]t is highly likely that Defendant Kelly spread the false statements to other County employees and abused any qualified privilege by excessive publication." Doc. 148, p. 14. He provides no admissible evidence, however, for his allegations. *See Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment."), *superseded by rule on other grounds as recognized in Carolina v. JPMorgan Chase Bank NA*, 2021 WL 5396066, at *5 (D. Ariz. Nov. 17, 2021). De Silva fails to provide clear and convincing evidence from which a reasonable trier of fact could find in his favor on the issue of excessive publication.

There is no genuine dispute as to any material fact on the issue of conditional privilege or actual malice or excessive publication. The defendants are entitled to summary judgment on the defamation claim.

De Silva argues that the "abuse of the privilege" issue should be decided at trial because "whether the occasion for the privilege was abused is a question of fact for the jury." Doc. 148, p. 14 (*citing Green Acres Tr. v. London*, 141 Ariz. 609, 616, 688 P.2d 617, 624 (1984)). The court agrees that this is a question of fact, but the plaintiff is entitled to put

this question of fact before a jury only if he offers sufficient evidence to establish a genuine issue of material fact. And he has not done so.

Title VII Discrimination: Buyer Principal

De Silva was originally hired by the Pima County Procurement Department (PCPD) as a Buyer Senior with the Materials and Services (M&S) Division starting on February 28, 2022. Doc. 148, p. 6; Doc. 105, p. 2. His hiring was recommended by Defendant Ana Wilber and approved by Defendant Terri Spencer. Doc. 105, p. 2.

On April 22, 2022, De Silva applied for the position of Buyer Principal along with two other internal candidates, Judy Cooper and Lorraine Gonzales. Doc. 148, p. 6; Doc. 105, p. 2. All three candidates were interviewed for the position and given a written test. Doc. 105, p. 2. The candidates were scored as follows: Cooper, 113; De Silva, 106; Gonzales, 101. *Id*.

The Pima County Procurement Department (PCPD) decided to hire Gonzales. She had the lowest score, but she "had two years of experience as a Buyer-Senior in the M&S Division, four years in the Design and Construction Division, and more than a decade as office and administrative support with PCPD." Doc. 105, p. 2. A note in the file reads in part as follows: "The Hiring Manager and Procurement Director agree that the best fit for this position has the lowest overall score. This candidate has been a Buyer Senior in the Procurement Department since 2016 and has the most experience in the M&S [Materials and Services] Division." Doc. 149-3, p. 12; *see* Doc. 105, p. 17; Doc. 146-1, p. 9. De Silva had considerable private sector experience, but he had been with the PCPD "for only fifty-three days when he applied." Doc. 105, p. 17; Doc. 148, p. 14.

"Title VII makes it an unlawful employment practice for an employer to refuse to hire an individual because of "race, color, religion, sex, or national origin." *Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1037 (9th Cir. 2005); 42 U.S.C. § 2000e–2(a)(1). Where, such as here, there is no direct evidence of discrimination, the plaintiff "may establish a prima facie case under the burden-shifting framework set forth in *McDonnell Douglas*

*Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Dominguez-Curry*, 424 F.3d at 1037.

"To make out a prima facie case under *McDonnell Douglas*, a plaintiff must show that (1) [he] belongs to a protected[1] class; (2) [he] applied for and was qualified for the position [he] was denied; (3) [he] was rejected despite [his] qualifications; and (4) the employer filled the position with an employee not of plaintiff's class . . . ." *Dominguez-Curry*, 424 F.3d at 1037. "At summary judgment, the degree of proof necessary to establish a prima facie case is minimal and does not even need to rise to the level of a preponderance of the evidence." *Id*. The court uses a version of the *McDonnell Douglas* framework applied by the Ninth Circuit to a "failure-to-promote" claim. *Id*.

"If established, the prima facie case creates a rebuttable presumption that the employer unlawfully discriminated against the plaintiff." *Id*. "The burden of production then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action." *Id*. "If the employer meets this burden, the presumption of unlawful discrimination simply drops out of the picture." *Id*. (punctuation modified). "The plaintiff then must produce sufficient evidence to raise a genuine issue of material fact as to whether the employer's proffered nondiscriminatory reason is merely a pretext for discrimination." *Id*. "The plaintiff may show pretext either (1) by showing that unlawful discrimination more likely motivated the employer, or (2) by showing that the employer's proffered explanation is unworthy of credence because it is inconsistent or otherwise not believable." *Id*. "Ultimately, the plaintiff's burden is to produce some evidence suggesting that the defendant's failure to promote [him] was due in part or whole to discriminatory intent." *Id*. If, as in this case, the plaintiff offers only circumstantial evidence of discriminatory intent, the plaintiff must produce "specific and substantial" evidence of pretext. *Id*. at 1038; *see also Franett-Fergus v. Omak Sch. Dist*. 19, 743 F. App'x 855, 858 (9th Cir. 2018) (The plaintiff "must point to

---

[1] The defendants do not dispute this first factor. Doc. 105, p. 16. De Silva states in his Complaint that he is "an Asian American minority individual, having a brown color complexion, with a national origin from Sri Lanka." Doc. 28, ¶ 24.

evidence both that the proffered reasons were false, and that discrimination was the real reason.") (punctuation modified).

Assuming De Silva has made out a prima facie case, the employer has articulated a legitimate, nondiscriminatory reason for its action: Gonzalez had the most experience in the Procurement Department and in the M&S Division. Doc. 149-3, p. 12; *see Dominguez-Curry*, 424 F.3d at 1037. To survive summary judgment, De Silva must "produce sufficient evidence to raise a genuine issue of material fact as to whether the employer's proffered nondiscriminatory reason is merely a pretext for discrimination." See *Dominguez-Curry*, 424 F.3d at 1037. He has not done so.

De Silva asserts that he had "over 20 years of private procurement/purchasing experience," and therefore he was a better candidate than Gonzales, who had "only a little over 6 years of governmental procurement experience." Doc. 148, p. 14. He implies that the defendant's failure to hire the "better" candidate shows that the defendants' proffered reason for hiring Gonzalez is unworthy of credence. The court does not agree. It does not strike the court as unusual that a governmental procurement office would find governmental procurement experience more valuable than private sector procurement experience, let alone governmental procurement experience in the very office that is doing the hiring. At best, De Silva has shown that the defendants' preferences were foolish or misguided. That, however, is not evidence of unlawful discrimination. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002) ("[C]ourts only require that an employer honestly believed its reason for its actions, even if its reason is foolish or trivial or even baseless.") (punctuation modified).

De Silva argues that favoring governmental procurement experience is contrary to the job posting that stated that the preferred qualification for the job was "two (2) years of responsible procurement experience in a governmental or private purchasing system." Doc. 148, p. 14. The court does not agree. The job posting does not promise that private purchasing experience would be valued as highly as procurement experience in the governmental sector. *See also Sobol v. DeJoy*, 2024 WL 3360990, at *11 (D. Haw. July 9,

2024) (The fact that "the job posting did not perfectly encapsulate the duties of the position" was not evidence of pretext.).

De Silva maintains that putting a premium on governmental procurement experience is unwise because then good candidates outside government will not be hired. That might be so, but it is not so unwise that the defendants' alleged preference for an in-house candidate is unworthy of credence. *See Sobol v. DeJoy*, 2024 WL 3360990, at *8 (D. Haw. July 9, 2024) ("[T]he mere fact that an employer misjudged the qualifications of the applicants does not in itself mean that the decision was motivated by discrimination.") (punctuation modified).

De Silva further argues that the entire hiring process was an elaborate conspiracy to mask the defendants' true purpose. He asserts that the defendants were "following an initial scheme, acted unlawfully or unethically by taking unusual steps towards that during the hiring process, and devised a cover-up." Doc. 148, p. 15. "The scheme was to promote Gonzales, irrespective of the other candidates' scores or performances." *Id*. De Silva's then proceeds to highlight certain irregularities in the hiring record. *Id*.

He asserts first that the defendants "incorrectly scored Plaintiff's assessment sheet, reducing his score by 30 points." *Id*. He does not, however, clearly explain how that happened. *Id*.

In their reply, the defendants explain that they reviewed the written test and candidly admit that there are places where one could argue that the test was inaccurately scored based on the way the questions are interpreted and the idiosyncratic way that Microsoft Excel operates. Doc. 150, pp. 14-15. Nevertheless, they maintain that these errors do not advance De Silva's argument because they have uncontradicted evidence that the tests employ "blind" scoring, where the test sheets are identified only by a random identifying number so the scorekeeper does not know which candidate submitted which test answers. Doc. 150, pp. 15-16. Even if the test scoring was inaccurate, De Silva provides no evidence that these errors were manufactured to disadvantage him.

De Silva asserts that other irregularities show that the defendants were acting unlawfully. He maintains that Defendant Wilber falsely told him "that he had not done well *in the interview* and that the other two candidates were being further considered." Doc. 148, p. 16 (emphasis added). He asserts this statement is false because he was ranked second in the scoring. Doc. 148, p. 16 (citing CSOF, ¶ 121).

De Silva's characterization of Wilber's statement, however, might not be entirely accurate. In his statement of facts, De Silva states that "Plaintiff was informed by Ana Wilber that two other candidates *had done better than him* and would be moving forward in the hiring process." Doc. 149, ¶ 121 (emphasis added). It is equally likely that the phrase "had done better than him" refers not to his scoring (which seems not to have mattered much) but to the fact that the other applicants otherwise appeared to be stronger candidates, possibly because they had more governmental experience. *See* Doc. 105, p. 2.

Moreover, as the defendants point out, Wilber hired De Silva only three months prior. Doc. 150, pp. 8-10, 15. It seems unlikely that Wilber would engage in an elaborate conspiracy to unlawfully discriminate against De Silva in May when she hired him the previous February. *See Coghlan v. Am. Seafoods Co. LLC.*, 413 F.3d 1090, 1096 (9th Cir. 2005) ("[W]here the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory action.").

De Silva recognizes the existence of this so called "same actor" inference, but he maintains that it does not always hold. Doc. 148, p. 18 (*citing, among other things, Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S. Ct. 849, 28 L. Ed. 2d 158 (1971) for the proposition that "[t]he employer was willing to hire minorities to shovel coal but unwilling to promote or transfer them to more desirable positions."). The court agrees that exceptions to the general rule certainly exist; however, De Silva's fails to present evidence supporting his argument that this is one of those exceptional situations. Doc. 148, p. 18. Presumably the position of Buyer Senior is more desirable that the position of Buyer Principal (or De Silva would not have applied for it), but he presents no evidence that the positions are so different

that an employer would tolerate a minority in the latter position but not the former. In any case, the gist of Wilber's statement seems to have been true because a subsequent interview was held for Cooper and Gonzales, but not for De Silva, on May 26, 2022. Doc. 150, pp. 17-18.

De Silva further directs the court to a note in the file dated 5/19/22 (the date of the first interview) that states that Gonzales was chosen for the position despite being the lowest scorer. Doc. 148, p. 16. He finds the date of this note suspicious because it appears to have been made before this alleged second interview when the hiring decision was made. *Id*. He argues that backdating this note, assuming that a second interview was even held, is further proof that the defendants acted unlawfully. *Id*.

On this issue, the defendants provide a sworn affidavit from Terri Spencer "who not only confirmed that the second interview was held on May 26, 2022, but explained that she directed that the note be placed in PCPD's files [by Burch] after deciding to promote Gonzales." Doc. 150, p. 18. The defendants suggest that the note was dated 5/19/22, the date of the first interview, because the note describes the candidates' scores, which were calculated after the first interview.

But regardless of why this date appears or what Wilber actually said to De Silva, none of this "evidence" helps De Silva establish that the defendants' proffered reason for their hiring decision is a pretext for unlawful discrimination. De Silva implies that every irregularity is proof that the defendants were engaging in an elaborate "cover-up," but, as the defendants point out, there was no need for a "cover-up." *See* Doc. 148, pp. 15-16; Doc. 150, p. 17. Gonzalez had more in-house experience and it was perfectly reasonable to favor the candidate with more in-house experience. *See* Doc. 105, p. 2. There was no need for an elaborate "cover-up" because there was nothing to hide. *See Sobol v. DeJoy*, 2024 WL 3360990, at *8 (D. Haw. July 9, 2024) ("[S]imply pointing to irregularities in the selection process will not overcome a motion for summary judgment unless those irregularities suggest that the employer's stated reasons for not hiring the plaintiff were pretextual," that is, those reasons were false *and* discrimination was the real reason.).

De Silva also presents evidence indicating that he was, in fact, a better choice for the position. He states that he was given a lot of work after Gonzales was promoted, work that should have been assigned to her. Doc. 148, p. 17. He cites to a "statement[2] provided by a current Procurement Officer" who "witnessed and had knowledge of the facts" and has "clearly stated that not only was Plaintiff entrusted with more work to include 'special tasks and reports,' but he was also entrusted with 'some if not most' of Gonzales's workload and work she was 'unable to or incapable of completing.'" Doc. 148, p. 17 (citing CSOF, Ex. 26). According to De Silva, this evidence proves that he was objectively the best candidate for the job. De Silva's argument, however, misinterprets his burden at this stage of the *McDonnell Douglas* analysis.

After the defendants proffer a non-discriminatory reason for their actions, the plaintiff must show pretext, that is, the defendants' stated reason for hiring someone else is false and discrimination is the real reason. In other words, De Silva must provide evidence that the defendants were not telling the truth when they said that they hired Gonzales because they thought she had the most in-house experience. De Silva's assertion that he was objectively the best candidate for the job is not particularly relevant. It does not matter if the defendants made a good choice. It only matters if they *thought* they were making a good choice and they honestly reported why they made that choice. The fact that they might have made an objectively poor choice does not show that their proffered reason was false. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002) ("[C]ourts only require that an employer honestly believed its reason for its actions, even if its reason is foolish or trivial or even baseless.") (punctuation modified).

De Silva argues that this elaborate scheme was devised "to promote Gonzales, irrespective of the other candidates' scores or performances." Doc. 148, p. 15. The court is

---

[2] The defendants argue that this statement may not be considered by the court because of its late disclosure. Doc. 150, pp. 20-21. They further assert that it lacks foundation and presumably is inadmissible. *Id.* The court need not decide the issue at this time because assuming, without deciding, that it may be considered, it does not affect the court's analysis of the motion for summary judgment.

not convinced, but even if his suspicions were correct and the defendants were in the tank for Gonzalez, his allegations do not prove unlawful discrimination. "Favoritism, unfair treatment and unwise business decisions do not violate Title VII unless based on a prohibited classification." *Taken v. Oklahoma Corp. Comm'n*, 125 F.3d 1366, 1370 (10th Cir. 1997). And De Silva provides no evidence that *he* would have been the "favorite" but for his race, color, or national origin. *See* Doc. 28, ¶ 24; *see also City of Los Angeles, Dep't of Water & Power v. Manhart*, 435 U.S. 702, 711, 98 S. Ct. 1370, 1377 (1978) (Discrimination under Title VII occurs if "the evidence shows treatment of a person in a manner which but for that person's sex would be different.").

To survive summary judgment, De Silva must provide "specific and substantial" evidence that "the employer's proffered nondiscriminatory reason is merely a pretext for discrimination." *See Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1037-1038 (9th Cir. 2005). He has not done so.

<u>Title VII Discrimination: Procurement Officer</u>

On January 27, 2023, De Silva applied for the position of Procurement Officer. Doc. 148, p. 7. By this time, he had been working for the county for almost one year. Six applicants, including De Silva, applied and met the minimum requirements for the job. Doc. 105, p. 3. The "PCPD [Pima County Procurement Division] conducted a Subject Matter Expertise (SME) assessment to determine which applicants were most qualified" and would be offered an interview. Doc. 105, p. 3. The SME assessment, which was conducted by the defendant Scott Loomis, "placed heavy emphasis on public procurement experience as he needed to replace his most experienced Procurement Officer and had little time for training." Doc. 105, p. 3. De Silva's bachelor's degree was worth only 20 points in the assessment while public procurement experience was worth up to 60 points. Doc. 148, p. 7. De Silva did not make the cutoff and was not offered an interview. Doc. 105, p. 3.

Assuming that De Silva has made out a prima facie case, the employer has articulated a legitimate, nondiscriminatory reason for rejecting him: De Silva lacked sufficient public

procurement experience. *See Dominguez-Curry*, 424 F.3d at 1037. To survive summary judgment, De Silva must "produce sufficient evidence to raise a genuine issue of material fact as to whether the employer's proffered nondiscriminatory reason is merely a pretext for discrimination." See *Dominguez-Curry*, 424 F.3d at 1037. He has not done so.

De Silva argues first that the initial SME assessment was fraudulently designed to keep him from getting the job. He asserts that in the past, procurement officers were hired with less public procurement experience than he had. Doc. 148, p. 22. And if public procurement experience is not necessary, the SME's emphasis on this experience is evidence that the SME parameters were not devised in good faith but to discriminate against him. Doc. 148, pp. 22-24.

The defendants, however, provide uncontroverted evidence that the SME assessment parameters were devised by Defendant Loomis, and when he devised them, he did not know that De Silva had applied for the job. Doc. 105, p. 3; Doc. 150, p. 40. So he could not have devised the parameters to discriminate against De Silva.

De Silva asserts that because he previously applied for the Buyer-Principal position in April of 2022, "[i]t is inconceivable that a division manager was oblivious to the fact that there was a good possibility that Plaintiff would apply." Doc. 148, p. 19. The court is not persuaded. Loomis was a division manager, but De Silva did not work in Loomis's division. Doc. 150, p. 23. De Silva provides no evidence that he was on Loomis's "radar" and Loomis was aware of his future employment aspirations. De Silva provides only speculation, and that is not enough. *See McIndoe v. Huntington Ingalls Inc.*, 817 F.3d 1170, 1173 (9th Cir. 2016) ("Arguments based on conjecture or speculation are insufficient" to oppose summary judgment.).

De Silva submits considerable evidence about the circumstances surrounding the job search. He notes that the defendants were informed on January 18, 2023 that the previous procurement officer would be retiring. Doc. 148, p. 20. Pima County Procurement Division staff, however, were not informed of the retirement until January 26, 2023, and in the meantime, Nichole Caballero was laterally transferred to "D&C" [Design and Construction].

Doc. 148, p. 20. This transfer, he asserts, enabled her to be trained and in position to pick up the slack when Cooper was eventually promoted[3]. Doc. 148, p. 20. These shenanigans, he argues, were part of an elaborate conspiracy to "facilitate the hand-picked and eventual promotion of Cooper to Procurement Officer within the coming weeks." Doc. 148, p. 20.

It appears that De Silva's conspiracy argument is no more than simple conjecture[4]. But even if he had evidence that Cooper was the favorite candidate, it would not show that he has suffered unlawful discrimination. "Favoritism, unfair treatment and unwise business decisions do not violate Title VII unless based on a prohibited classification." *Taken v. Oklahoma Corp. Comm'n*, 125 F.3d 1366, 1370 (10th Cir. 1997). Put another way, De Silva's alleged evidence of favoritism does not show that if he were the same race (or color or nationality) as Cooper, he would have been hired instead. *See City of Los Angeles, Dep't of Water & Power v. Manhart*, 435 U.S. 702, 711, 98 S. Ct. 1370, 1377 (1978) (Discrimination under Title VII occurs if "the evidence shows treatment of a person in a manner which but for that person's sex would be different.").

<u>Title VII Discrimination: Business Intelligence Analyst-Senior</u>

---

[3] The defendants offer a declaration from Loomis, the Division Manager of the D&C (Design and Construction) division. He states that "Ms. Caballero was transferred from the Admin. to the D&C Division in order to train her to support and possibly replace Monica Dennis, a Business Enterprise Coordinator with PCPD who was planning to retire." Doc. 150, p. 25. Moreover, "[s]he never worked as a Buyer, and thus was not transferred to replace Ms. Cooper as a Buyer Senior." *Id*.

[4] De Silva maintains that his recently disclosed witness, Brandon R. Morgan, "can corroborate Plaintiff's claims and rebut certain claims of Defendants." Doc. 148, p. 20. He does not, however, explain specifically what relevant evidence Morgan can add. De Silva attached Morgan's declaration to his Controverting Statement of Facts, but Morgan's declaration only supports De Silva's assertions as to *when* things happened. Doc. 149-4, p. 129. He provides no evidence to prove *why* they happened. The court finds that the Morgan declaration does not affect the court's analysis of this issue and therefore the court need not address at this time whether this witness's statements should considered.

De Silva subsequently applied for the position of Business Intelligence Analyst - Senior at the Pima County Health Department. Doc. 148, p. 7. On April 6, 2023, he interviewed for the position. *Id*. He scored 80 points, forty points each from the two interviewers, RiCharde Johnson and Dr. Amanda Sapp. Doc. 105, p. 5. De Silva was informed that he was not selected on April 13, 2023. *Id*. According to the defendants, "Dr. Sapp who led the interview process, ultimately decided against hiring Plaintiff based on his interest in [] telecommuting three to four days each week." Doc. 105, p. 5 (citing SOF ¶ 52); Doc. 146-1, p. 366, ¶ 11. The position was reopened for further applicants. Doc. 146, ¶ 53. Sapp did not participate further in the hiring process.

On May 22, 2023, the defendants Johnson and Lam interviewed another candidate, Ryscha Campbell, who only scored 67 points and hired her because "both agreed that Ms. Campbell would be the best fit for the position." Doc. 148, p. 7; Doc. 146, ¶ 60.

The defendants seem to concede that De Silva is in a protected class, he was qualified for the position, and he was rejected for the position by Sapp. Doc. 105, p. 21. They also seem to acknowledge that the position went to a person not of De Silva's class. Doc. 105, p. 22 ("Plaintiff's claim that Defendant Johnson hired Ms. Campbell [unlawfully] is purely based on an assumption that Defendant Johnson is biased in favor of black people . . . ."). They argue, however, that he was not "similarly situated" with Campbell, using a slightly different version[5] of the *McDonnell Douglas* analysis, and therefore the fact that she was hired instead of him is not evidence of discrimination. Doc. 105, pp. 21-23. They maintain that Campbell was interviewed by Johnson and Lam, who gave her a total of 67 points, and

---

[5] In the defendants' version of the *McDonnell Douglas* analysis, the plaintiff must establish at step 4 of the prima facie case that "the employer must have treated similarly situated individuals outside of that protected class more favorably." Doc. 105, p. 15; *see, e.g., Hawn v. Exec. Jet Mgmt., Inc*., 615 F.3d 1151, 1155–56 (9th Cir. 2010). This court's version of the analysis considers evidence of the differences between the plaintiff and the ultimately successful candidate when it evaluates the employer's alleged nondiscramatory reason for the hiring decision. *See Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1037 (9th Cir. 2005). The same evidence is considered but at a slightly later stage of the analysis. The court's ultimate decision on summary judgment is not affected by which version of the *McDonnell Douglas* analysis is used.

because Lam scored the interview differently from Sapp, the fact that De Silva scored more total points than Campbell is not evidence of discrimination. *Id.*

The court finds this discussion of interview points to be something of a red herring. The defendants do not assert that De Silva was rejected because of these interview points. They maintain that De Silva was rejected based on his interest in "telecommuting three to four days each week." Doc. 105, p. 5 (citing SOF ¶ 52); Doc. 146-1, p. 366, ¶ 11.

At first blush, it seems that De Silva has made out a prima facie case, but the employer has articulated a "legitimate, nondiscriminatory reason for its action." *See Dominguez-Curry*, 424 F.3d at 1037. It appears, however, that the defendants have not offered any admissible evidence for their proffered reason. They direct the court to a Declaration of Recharde Johnson in which he states as follows: "I do not recall what Ms. Sapp's exact rationale for her decision was, but I do recall that it involved Mr. De Silva asking about telecommuting three to four days per week." SOF ¶ 52; Doc. 146-1, p. 366. ¶ 11. It appears that Johnson is qualified to offer testimony that the decision to reject De Silva was made in whole or in part by Sapp. His statement that Sapp rejected De Silva because De Silva asked about telecommuting, however, appears to be inadmissible hearsay. *See* Fed.R.Evid 801(c), 802; *see also Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment."); Fed.R.Civ.P. 56(c)(2). If Johnson heard De Silva express an interest in telecommuting, he would be competent to testify about that, but it is unclear from his statement whether *he* heard De Silva make that request or Sapp told him that *she* heard it.

In any case, De Silva asserts that, "At no point in the interview did Plaintiff request telecommuting privileges." Doc. 148, p. 7 (citing CSOF ¶ 52; *Id.*, Ex. 28); Doc. 149, ¶ 52; De Silva Declaration, Doc. 149-4, p. 142, ¶ 45. And he should be qualified to testify about what he said, or did not say, at the interview.

The court concludes that there remains a genuine issue of material fact as to whether De Silva requested telecommuting privileges, who rejected De Silva, and why he was rejected. Summary judgment will be denied on the Title VII intentional discrimination claim

related to the position of Business Intelligence Analyst -- Senior at the Pima County Health Department.

Title VII Discrimination: Business Systems Analyst – Technical Writer

On May 4, 2023, De Silva interviewed for a position as a Business Systems Analyst – Technical Writer in the Pima County Information Technology Department. Doc. 105, p. 4. De Silva and another applicant, Sheri Prochaska, sat for a second, more informal interview on May 10, 2023. Doc. 105, p. 4; *but see* Doc. 146-1, p. 241 (The followup was conducted on May 8, 2023.). Prochaska was chosen for the job instead of De Silva. Doc. 105, p. 4. It appears that Defendant Miller and Defendant Lundin made the decision. Doc. 146-1, p. 234.

De Silva maintains that he scored 100 points in the Subject Matter Expertise (SME) assessment and scored 212 in the first interview. Doc. 148, pp. 7-8. He asserts that Prochaska scored only 60 points in the SME and 202 points in the first interview. *Id.*

Lundin explained that he chose Prochaska because she did "extremely well" on the second interview. Doc. 146-1, p. 241. He explained that "she elaborated on her experience as a communications professor and how she has had to write manuals and training guides for technical purposes in other roles which she had held." Doc. 146-1, p. 241. Lundin recommended that Prochaska be hired because "while Mr. De Silva could tell us what he *would do* in a scenario, Ms. Prochaska was able to tell us what she *had done* previously." *Id.* (emphasis added). In sum, "[s]he had many years of experience over Mr. De Silva in exactly what we were looking for." Doc. 146-1, p. 241.

Miller agreed with Lundin's assessment. Doc. 146-1, pp. 237-238. He believed that Prochaska had more relevant experience. *Id.* Also, she had considerable experience communicating directly with end-users. *Id.* And "her personality was warm, almost bubbly and [she] seemed really excited about filing this position." *Id.* He explained that "[i]t was very easy to imagine Sheri Prochaska standing in a room full of end-users and presenting non-technical information about technology in a way employees would enjoy." *Id.*

Assuming that De Silva has made out a prima facie case, the employer has articulated a legitimate, nondiscriminatory reason for its action: Prochaska was hired because she had the most relevant experience and she displayed the most enthusiasm for the position. *See Dominguez-Curry*, 424 F.3d at 1037. To survive summary judgment, De Silva must "produce sufficient evidence to raise a genuine issue of material fact as to whether the employer's proffered nondiscriminatory reason is merely a pretext for discrimination." *See Dominguez-Curry*, 424 F.3d at 1037. He has not done so.

De Silva asserts that he scored better than Prochaska in the SME and in the first interview. He concludes that he was the most qualified and the defendants' decision to hire Prochaska must be false. As the court observed above, however, it does not matter if De Silva was objectively the best candidate. It only matters whether the defendants were telling the truth when they explained their subjective reasoning for their decision to hire Prochaska. The fact that they might have chosen poorly is not evidence of unlawful discrimination. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002) ("[C]ourts only require that an employer honestly believed its reason for its actions, even if its reason is foolish or trivial or even baseless.") (punctuation modified).

De Silva further argues that the defendants' statement that they hired Prochaska because of her training experience was pretext because "the job posting did not require any trainer experience." Doc. 148, p. 26. The court does not agree. The job posting listed as a preferred qualification: "experience explaining new or updated technology to an end-user." Doc. 150, p. 32. This statement does not use the term "trainer" explicitly, but it does fairly inform prospective applicants that training experience would be valued. *See also Sobol v. DeJoy*, 2024 WL 3360990, at *11 (D. Haw. July 9, 2024) (The fact that "the job posting did not perfectly encapsulate the duties of the position" was not evidence of pretext.).

To survive summary judgment, De Silva must provide "specific and substantial" evidence that "the employer's proffered nondiscriminatory reason is merely a pretext for discrimination." *See Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1037-1038 (9th Cir. 2005). He has not done so.

<u>Title VII Discrimination: Administrative Review</u>

On May 10, 2023, De Silva asked the Human Resources Department to conduct an administrative review of the hiring process for the Technical Writer position. Doc. 105, pp. 5-6. De Silva objected to some of the questions asked in the second interview such as: "Can you give an elevator pitch of yourself for the job?" or "What methods or medium will you use to communicate with Pima County Employees of a system change?" Doc. 105, p. 6. Cathy Bohland instructed the department to gather documents and investigate the hiring process. Doc. 105, p. 6. Matt O'Connor was assigned to conduct the investigation. *Id.*

De Silva argues that the investigation was inadequate. Doc. 148, p. 28. He maintains that it was not completed on time. *Id.* He believes that his qualifications for the position were not fairly evaluated. *Id.* He asserts that because he received more points that Prochaska in the SME assessment and in the interview, he must have been the better candidate. Doc. 148, pp. 28-29. He objects to Miller's statements about Prochaska that "you can see her standing in front of a group and presenting," or that he could imagine her "standing in front of end-users presenting in a way employees would enjoy." Doc. 148, p. 29 (punctuation modified). He argues that "[i]t is hard to fathom how standing in front of users and presenting or teaching are related to technical writing, unless it was Defendant Miller's personal racial preference, contrary to clear job requirements." Doc. 148, p. 29; *but see* Doc. 150, p. 32 (The job posting listed as a preferred qualification: "experience explaining new or updated technology to an end-user.").

This court previously held that the defendants alleged failure to properly investigate De Silva's allegations of discrimination is not an adverse employment action for the purposes of a Title VII intentional discrimination claim. Doc. 65, pp. 14-16; s*ee also Chesley v. City of Mesquite*, 2023 WL 5206925, at *5 (D. Nev. Aug. 14, 2023) ("Courts generally refuse to consider a failure to investigate an adverse employment action" in part because employers might not investigate allegations at all if they thought an inadequate investigation would

result in liability.) (collecting cases). In the alternative, the court finds that De Silva has failed to provide evidence tending to establish a genuine issue of material fact.

The only evidence De Silva offers to prove that the allegedly inadequate investigation was the result of intentional discrimination are Miller's statements that he could imagine her "standing in front of end-users presenting in a way employees would enjoy." Doc. 148, p. 29 (punctuation modified). De Silva argues that this statement is a veiled reference to race and evidence of unlawful discrimination. Presumably, he believes that an *adequate* investigation would have made that connection. De Silva's suspicions, however, are not enough. *See McIndoe v. Huntington Ingalls Inc.*, 817 F.3d 1170, 1173 (9th Cir. 2016) ("Arguments based on conjecture or speculation are insufficient" to oppose summary judgment.).

Title VII: Disparate Impact

De Silva claims that certain Pima County employment practices violate Title VII because they have a disparate impact on Asians. Doc. 148, p. 30.

He describes four practices specifically: "1) Pima County Merit System Rules, which limit requests for administrative reviews and reporting of discrimination to only 10 days, 2) unchecked and unsupervised interview and written exam process where there is no oversight by the PCHRD [Pima County Human Resources Department] and this unaccountable selection process allowed in all County departments, 3) PCHRD not overseeing SME [Subject Matter Expertise] weight assignment, [and] 4) PCHRD not seeking justification from hiring managers on hiring decisions." Doc. 148, p. 30.

"To establish a prima facie case of disparate impact under Title VII, [the plaintiff] must: (1) show a significant disparate impact on a protected class or group; (2) identify the specific employment practices or selection criteria at issue; and (3) show a causal relationship between the challenged practices or criteria and the disparate impact." *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1190 (9th Cir. 2002). "If a plaintiff establishes a prima facie case, then the burden shifts to the employer to demonstrate that the challenged practice is job

related for the position in question and consistent with business necessity." *Bolden-Hardge v. Off. of California State Controller*, 2025 WL 2495655, at *8 (E.D. Cal. Aug. 29, 2025) (punctuation modified).

De Silva asserts that "Asian males and females employed at the county were at or near zero." Doc. 148, p. 30. He has identified four suspect employment practices. *Id.* He has not, however, provided any evidence that these practices are the cause of the low number of Asian employees. *Id.* He asserts that the 10-day deadline for requesting a hiring review makes it difficult for an employee to challenge a suspect hiring practice, but he does not provide evidence that this deadline affects Asians more than non-Asians. *Id.* He argues that a lack of hiring oversight makes unlawful hiring practices more likely, but he does not provide evidence that Asians are disproportionally affected. *Id.* He maintains that these practices adversely affected him as an individual and he is Asian, but that is not enough. Doc. 148, pp. 31-32; *see, e.g., Griggs v. Duke Power Co.*, 401 U.S. 424, 426, 430 91 S. Ct. 849, 851, 853 (1971) (Employer violated Title VII by "requiring a high school education or passing of a standardized general intelligence test as a condition of employment" when "(a) neither standard is shown to be significantly related to successful job performance, [and] (b) both requirements operate to disqualify Negroes at a substantially higher rate than white applicants" because Negroes "have long received inferior education in segregated schools.").

<u>Title VII: Retaliation for Raising Objection to the Procurement Officer Hiring</u>

To make out a claim for Retaliation pursuant to Title VII, "a plaintiff must show (1) involvement in a protected activity, (2) an adverse employment action and (3) a causal link between the two." *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000). "Thereafter, the burden of production shifts to the employer to present legitimate reasons for the adverse employment action." *Id.* "Once the employer carries this burden, plaintiff must demonstrate a genuine issue of material fact as to whether the reason advanced by the employer was a pretext." *Id.* "Only then does the case proceed beyond the summary judgment stage." *Id.*

An "adverse employment action" is a "non-trivial employment action[] that would deter reasonable employees from complaining about Title VII violations." *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000). "Among those employment decisions that can constitute an adverse employment action are termination, dissemination of a negative employment reference, issuance of an undeserved negative performance review and refusal to consider for promotion." *Id*. "By contrast, [the Ninth Circuit has] held that declining to hold a job open for an employee and badmouthing an employee outside the job reference context do not constitute adverse employment actions." *Id*., pp. 928–29.

After De Silva complained about the Procurement Officer hiring process, Defendant Spencer organized a meeting and "brought Plaintiff into the meeting on only a few minutes notice." Doc. 105, p. 32; Doc. 148, p. 32. The meeting was held on March 1, 2023, the day after the conclusion of De Silva's 1-year probationary period, but he "was yet to receive a letter confirming that his probation had ended." Doc. 148, p. 32. De Silva maintains that without that letter, he "was subject to termination without cause," and because of his precarious employment situation, the meeting constituted a veiled threat.

The defendants assert that the meeting was held because they "wanted to address his concerns by explaining how the SME process worked and what Plaintiff could do to better represent himself in the future." Doc. 105, p. 32.

The court agrees that complaining about discrimination in the hiring process is a protected activity, but it finds that calling an employee into a meeting to discuss the employee's hiring concerns does not rise to the level of an adverse employment action even if the meeting was held after De Silva's probationary period had ended but before he received a letter confirming that fact. A reasonable employee would not be surprised if, after he raised a complaint about a suspect hiring practice, the employer called him into a meeting to discuss that complaint. In fact, a reasonable person could find that *not* addressing his concerns was more likely a retaliatory action.

De Silva asserts that he was in a precarious employment situation because he was subject to termination without cause until he received his letter confirming that his

probationary period was over. He provides no evidence to support his allegation however. Presumably his probation period ended after the 1-year period. De Silva explains that he sincerely felt threatened, but the test for an "adverse employment action" is objective, not subjective. *See, e.g., Hardage v. CBS Broad., Inc*., 427 F.3d 1177, 1189 (9th Cir. 2005) ("'[S]nide remarks' and threats, such as 'your numbers up' and 'don't forget who got you where you are" did not rise to the level of an "adverse employment action" for the purposes of a retaliation claim.), amended on denial of reh'g, 433 F.3d 672 (9th Cir. 2006), amended on denial of reh'g, 436 F.3d 1050 (9th Cir. 2006).

In the alternative, the court finds that the defendants have expressed a legitimate reason for holding the meeting. They wanted to address De Silva's complaint and explain how the SME process worked. De Silva presents no evidence that they knew when his probationary period was to end when they conducted the meeting. Doc. 148, pp. 32-33.

De Silva maintains that the individual defendants had an obligation to forward De Silva's complaint to the Human Resources Department and should not have tried to resolve his complaint by themselves. Doc. 148, p. 33. He asserts that their failure to follow the proper procedure shows that the defendants' alleged reason for holding the meeting is a pretext, and moreover, it constitutes an additional adverse action. De Silva does not, however, provide any evidence that this is the proper procedure and that the defendants knowingly violated that proper procedure. He cannot "demonstrate a genuine issue of material fact as to whether the reason advanced by the employer was a pretext." *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000). He has not established that the individual defendants' attempt to address his employment concerns was itself an adverse employment action.

<u>Title VII Retaliation: Inadequate Investigation</u>

In his Second Amended Complaint, De Silva alleges that he sent emails to Defendant Cathy Bohland on June 12, 2023 and June 14, 2023 asking her to investigate the Procurement Officer hiring process. Doc. 28, pp. 30-31. He alleges that she "was not willing to conduct

any investigation as it had not been reported to HR within 10 days of occurrence." Doc. 28, p. 31; Doc. 148, pp. 30-31 (citing CSOF ¶¶ 67, 82-85; Ex. 25). He claims this was retaliation. *But see Patocs v. Automatic Data Processing Inc.*, 2022 WL 2702507, at *12 (D. Ariz. July 12, 2022) ("[T]he coaching and scrutiny Plaintiff experienced, and Defendant's inadequate internal investigation are not adverse actions for the purposes of her retaliation claim.").

The defendants explain that when De Silva made complaints about the Procurement Officer position "it was past the ten-day deadline to request an *administrative review* from HR." Doc. 105, p. 6 (emphasis added). "Instead, HR considered Plaintiff's complaints regarding the Procurement Officer position as a separate allegation of *discrimination*, which is not subject to a ten-day deadline." *Id*. (citing SOF ¶ 83-85) (emphasis added). Apparently the defendants make a distinction between a request for an "administrative review," which they want to resolve before the new employee begins work, and a request for an investigation of "discrimination." Doc. 146, p. 11.

But setting aside the semantic arguments, HR did consider De Silva's request in spite of his timing. They determined, however, that his allegation of discrimination was without a factual basis. According to the defendants, "HR determined that an investigation [of discrimination] was not necessary, because Plaintiff's complaints had to do with a part of the SME process that occurred before Defendant Loomis was aware of the identities of the applicants for the position." *Id*. (citing SOF ¶ 85) (citing PC005991-005998); Doc. 146-1, pp. 379-86; Doc. 146-1, ¶¶ 8, 15, 16, 23, 37, 39, 40, 41.

De Silva asserts that "it was Defendant Bohland . . . who, when Plaintiff directly made the discrimination complaint about the Procurement Officer hiring process, and asked that she investigate, categorically invoked the ten-day rule and refused to conduct an investigation." Doc. 148, p. 30. In fact, while the defendants may have refused to conduct an "administrative review," they did "investigate" his discrimination complaint. They decided that it was meritless because Loomis did not know that De Silva was applying for the job when he created the SMS criteria. As the court explained above, De Silva has not

provided evidence establishing that Loomis knew that De Silva was applying for the job when he created the SMS criteria. De Silva cannot prove that the hiring process was discriminatory; therefore, he cannot establish that the defendants' investigation was inadequate. *See also Tritchler v. Cnty. of Lake*, 358 F.3d 1150, 1155 (9th Cir. 2004) ("[A] finding of discrimination is required before a failure to investigate a discrimination complaint would become actionable."). He has not established an "adverse employment action."

<u>Title VII Retaliation: Not Extending De Silva's Resignation Date</u>

On April 13, 2023, De Silva gave notice of his resignation effective May 10, 2023. Doc. 105, pp. 3-4. (April 13, 2023 was apparently the day he was told that he was not being selected for the position of Business Intelligence Analyst - Senior. Doc. 148, p. 7.) "In response to this, and in preparation for an upcoming increase in workload, Defendant Spencer worked with County Administration to reclassify Plaintiff's position from a Buyer-Senior to a Procurement Officer once Plaintiff vacated it." Doc. 105, p. 4.

On May 9, 2023, De Silva asked to push his resignation date back to May 19, 2023, and take vacation during this time. Doc. 105, p. 4. Spencer denied the request "because it had no benefit for [her department] but would have delayed reclassifying the position." *Id*.

De Silva implies that denying his request to change his resignation date was an adverse employment action taken in retaliation for raising complaints about his employer's hiring practices. Doc. 148, p. 33. The court disagrees. A reasonable employee would not be deterred from raising Title VII issues for fear that his or her resignation date would not be rescheduled should he or she ask that it be modified. This is not an adverse employment action for the purposes of a Title VII retaliation claim. *See Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000).

In the alternative, the court finds that the employer has articulated a legitimate reason for the employment action. Spencer denied the request "because it had no benefit for [her department] but would have delayed reclassifying the position." Doc. 105, p. 4.

De Silva argues that the defendants' alleged reason for denying his request is false because "[t]he reclassification of a buyer position took months to take [] effect based on [Plaintiff's] belief and thus was not an immediate priority." Doc. 148, pp. 33-34. De Silva, however, provides no evidence to support his statement about the speed with which reclassification proceeds. And even if it were true, he provides no evidence that Spencer knew that and viewed the reclassification as "not an immediate priority." Presumably, if reclassification were a lengthy process, it was more important, not less, to get the process started as soon as possible.

De Silva fails to "demonstrate a genuine issue of material fact as to whether the reason advanced by the employer was a pretext." *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000).

<u>Title VII Retaliation: Hostile Work Environment</u>

De Silva claims that Spencer retaliated against him by creating a hostile work environment. "A hostile work environment may constitute an adverse employment action for purposes of a retaliation claim." *Yonemoto v. McDonald*, 114 F. Supp. 3d 1067, 1106–07 (D. Haw. 2015), *aff'd sub nom. Yonemoto v. Shulkin*, 725 F. App'x 482 (9th Cir. 2018); *see Ray v. Henderson*, 217 F.3d 1234, 1245 (9th Cir. 2000). "Retaliation in the form of a hostile work environment is actionable only if it is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* (Punctuation modified). "To determine whether a work environment is sufficiently hostile, the court must look to the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.*

De Silva does not clearly explain what Spencer did to create this hostile work environment other than deny his request to push back the date of his resignation. This single action was not "threatening or humiliating" and did not "unreasonably interfere" with his

"work performance." De Silva has not provided sufficient evidence that he experienced a hostile work environment.

Title VII Retaliation: Kelly's Allegedly Defamatory Statements

When he was passed over for the Technical Writer position, De Silva sent an email to Pima County's Human Resources Department seeking an administrative review of the hiring process. Doc. 105, pp. 5-6 ; Doc. 146, ¶¶ 62-63. As part of this administrative review, "Defendant Kelly stated that she reca[lled] Plaintiff being very intense, often slapping the table abruptly throughout the interview process." Doc. 146, ¶ 68 (punctuation modified).

Around July 20, 2023, De Silva filed a charge of discrimination with the Arizona Attorney General and with the Equal Employment Opportunity Commission. Doc. 105, p. 7; Doc. 146, ¶ 69. "Defendant Kelly provid[ed] a sworn affidavit in which she repeated her statement that Plaintiff hit a table to emphasize his statements during the May 4, 2023 interview for the Technical Writer position and again during the May 10 interview for the Business Systems Analyst – Senior position." Doc. 105, p. 7; Doc. 146, ¶ 70. According to the defendants, Kelly made these statements because she believed they were true and they "added useful context to explain why Plaintiff was not chosen for the Technical Writer position." Doc. 105, p. 34.

De Silva argues that Kelly's statements were retaliation for bringing Title VII complaints. Assuming without deciding that De Silva has established a prima facie case, the defendants have offered legitimate business reasons[6] for Kelly's statements. They were

---

[6] Although the court has not found a case directly on point, it appears that the court's finding above that Kelly's statements are conditionally privileged in the context of defamation law resolves the Title VII retaliation "legitimate business reason" issue. *See Sovie v. Town of N. Andover*, 742 F. Supp. 2d 167, 174 (D. Mass. 2010) ("The conditional privilege is a natural corollary of the privilege to publish defamatory material if the publication is reasonably necessary to the protection or furtherance of a legitimate business interest.") (punctuation modified).

offered to assist the investigations into De Silva's allegations of discrimination. De Silva fails to "demonstrate a genuine issue of material fact as to whether the reason advanced by the employer was a pretext." *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000).

Intentional Discrimination in Violation of 42 U.S.C. § 1983

De Silva asserts that the various individual defendants intentionally discriminated against him in violation of 42 U.S.C. § 1981 and the equal protection clause of the Fourteenth Amendment. Doc. 28, pp. 31-42. He claims those violations may be raised pursuant to 42 U.S.C. § 1983. *Id*. The defendants maintain, and De Silva agrees, that the court's findings regarding the intentional discrimination claims brought pursuant to Title VII are dispositive of the intentional discrimination claims brought pursuant to 42 U.S.C. § 1983. Doc. 105, p. 35; Doc. 148, p. 34.

"A plaintiff who fails to establish intentional discrimination for purposes of Title VII also fails to establish intentional discrimination for purposes of 42 U.S.C. § 1983." *Sischo–Nownejad v. Merced Cmty. Coll. Dist*., 934 F.2d 1104, 1112 (9th Cir.1991), *superseded by statute on other grounds as recognized in Dominguez–Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1041 (9th Cir.2005); *see also Patocs v. Automatic Data Processing Inc*., 2022 WL 2702507, at *3 (D. Ariz. July 12, 2022) ("The standards for analyzing § 1981 claims are the same as those applicable in Title VII disparate treatment cases.").

The defendants are entitled to summary judgment on all Title VII intentional discrimination claims except for the claim arising from De Silva's application for the position of Business Intelligence Analyst - Senior at the Pima County Health Department. The defendants are therefore entitled to summary judgment on all intentional discrimination claims brought pursuant to 42 U.S.C. § 1983 except for the claim arising out of that application.

*Monell* Claims pursuant to 42 U.S.C. § 1983

"Section 1983 also imposes liability upon municipalities for constitutional deprivations resulting from actions taken pursuant to government policy or custom." *Karim-Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 624 (9th Cir. 1988), *abrogated in part on other grounds as stated in Boarman v. County of Sacramento*, 2013 WL 1326196, at 7 (E.D.Cal. 2013), (*citing Monell v. Dep't of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978)). But "where there is no underlying constitutional violation by an individual government employee, there can be no *Monell* liability by the local government." *Bowen v. Cnty. of Los Angeles*, 2018 WL 6038293, at *4 (C.D. Cal. Jan. 29, 2018).

"[A] municipality may be liable under § 1983, just as natural persons are, because when Congress enacted § 1983 it intended municipalities and other local government units to be included among those persons to whom § 1983 applies." *Gibson v. Cnty. of Washoe, Nev.*, 290 F.3d 1175, 1185 (9th Cir. 2002), *overruled on other grounds recognized in Castro v. Cnty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016). "To show that the municipality violated someone's rights or instructed its employees to do so, a plaintiff can prove that the municipality acted with 'the state of mind required to prove the underlying violation,' just as a plaintiff does when he or she alleges that a natural person has violated his federal rights." *Id*.

But "a plaintiff need not allege that the municipality itself violated someone's constitutional rights or directed one of its employees to do so." *Id*. Instead, a plaintiff can allege that through its omissions the municipality is responsible for a constitutional violation committed by one of its employees, even though the municipality's policies were facially constitutional, the municipality did not direct the employee to take the unconstitutional action, and the municipality did not have the state of mind required to prove the underlying violation." *Id*.

In this case, De Silva alleges that the defendant Pima County Government "had systems, customs, practices, policies and procedures in place that perpetuated and allowed

for intentional unlawful discrimination and/or retaliation to take place due to Plaintiff's race (Asian), color, and national origin . . . ." Doc. 28, pp. 31-32.

De Silva claims specifically that the county has a custom and practice of allowing managers to pre-select internal candidates for their open positions based on their own "preferred racial association and likeness." Doc. 28, p. 7. He argues that this policy is supported by the Pima County Merit System Rules, "which limit requests for administrative reviews and reporting of discrimination to only 10 days and does not provide any punitive action for violators." *Id.* Further, he asserts there is no oversight of the interview and hiring process. *Id.*

De Silva does not claim that Pima County established policies that are intentionally discriminatory. Instead, he argues that Pima County's policies allow its employees unfettered freedom to discriminate.

"In order to impose liability based on a policy of deliberate inaction, the plaintiff must establish: (1) that he possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and (4) that the policy was the moving force behind the constitutional violation." *Berry v. Baca*, 379 F.3d 764, 767 (9th Cir. 2004) (punctuation modified).

According to the defendants, "Plaintiff has adduced no evidence or allegations which would allow a finder of fact to determine that his alleged policy exists, much less that it was a result of deliberate indifference or that it motivated any of the alleged constitutional violations against him." Doc. 105, p. 36.

De Silva does not address any of these specific issues in his response brief other than to assert in conclusory form that "Plaintiff's discrimination claims have shown to have no deficiencies, and he has shown that the Defendants' reasons are pretext and not worthy of credence." Doc. 148, p. 34.

The court finds that De Silva has provided evidence that the County conducts its hiring in accordance with certain policies. He has not, however, presented evidence showing

that these policies amount to "deliberate indifference" to his constitutional rights or that these policies were "the moving force" behind the defendants' alleged discriminatory failure to hire him. He cannot establish a genuine issue of material fact.

IT IS ORDERED that the defendants' motion for summary judgment filed on October 17, 2025, is Granted in Part. Doc. 105.

The motion is granted for all claims except for the plaintiff's intentional discrimination claims arising from his application for the position of Business Intelligence Analyst - Senior at the Pima County Health Department.

DATED this 15th day of September, 2026.



Honorable Michael A. Ambri
United States Magistrate Judge